MONROE, C. J.
Defendant, convicted of murder without capital punishment and sentenced to imprisonment at hard labor for life, prosecutes this appeal, and relies upon a single bill of exception, reserved to the overruling of a motion for new trial, in which it is alleged (in substance) that T. A. Reynolds, a tales juror, who served in the case, had a fixed opinion (prior to his selection), was prejudiced against defendant, and had expressed the opinion that defendant should be hanged or mobbed; that on his voir dire, he had stated that he knew nothing about the case, had no opinion as to the guilt or innocence of defendant, and no prejudice against him, and could, and would, give him an impartial trial, all of which defendant believed to be true; that, after the conviction, defendant’s counsel learned that, shortly after'the homicide -for which defendant is prosecuted, Reynolds had made the statements hereinabove attributed to him, and, had they possessed that information when he was selected, they would not have accepted him, but, that he concealed the facts stated In order to get on the jury, and was not a competent juror.
The testimony taken on the hearing of the motion was reduced to writing and annexed to the bill; the statement per curiam is that
“The court does not think the evidence supports the application for a new trial.”
It appears from that evidence that some of the contractors in the oil field in Claiborne parish employed white drivers and others employed-negroes; that at one time, possibly a year or nine months before the killing here in question, there was trouble between the drivers of the two races, and the sheriff appointed a number of employers of negro drivers to keep the peace and protect the negroes; that the defendant .herein was one of the employers so appointed; that the ¡juror Reynolds, was a white driver; and we infer that Dunson, who was killed, and whom the witnesses speak of as a boy, was also a white driver, though there is nothing positive in the record to that effect.
The first witness called on behalf of defendant was Elmer Aycock who, being asked what he had heard Reynolds say, shortly after the homicide, answered as follows:
“Well, I don’t know whether I could state it just exactly or not; just the same. I saw him out at Lisbon; he came out there. I had heard of the killing, and knew he worked in the field [meaning in the oil field]. I asked him what about it, and he told me Shannon had killed this man Dunson about one of his negro drivers, and there was a good deal of feeling about it, and Shannon ought to be killed or hung about it, or something like that; and there was a good deal of talk — good deal of feeling among the oil field-workers, seemingly about it; seemed like the feeling was because he knew his negro drivers, and he was willing to go with them out there to hang him, if necessary, and run the negroes off. I believe that was about the substance of his statement. Q. Said he was willing to go with them and hang him and run the negroes off? A. Yes; that was about the substance.”
Aycock further testified that he attended the trial, during two days (as we understand him) and was surprised to see Reynolds on the jury, but, that, though he was very intimate with Mr. Goff, one of defendant’s counsel, he did not mention to him what he had heard Reynolds say, until after the con *643 viction; that he had no interest in the matter; did not know that it was any of his business; and that, after the conviction, he was talking to Mr. Goff, and then “merely mentioned it to him.” He also testified that he had not been trying to find witnesses to corroborate his testimony, and had seen none at all; that the conversation between him and Reynolds took place on the porch of the store of White, Reynolds & Co. (the Reynolds of that firm not being the one who was the juror), “immediately on his [Reynolds] coming” ; that he asked him about the killing; that there was general talk about the case, among lots of people. Being asked who was present at the conversation, he replied:
“Well, there was — I don’t remember who all was present — several parties, going in and out.”
And further as follows:
“Q. Mr. McDonald there? A. I don’t remember; he might have been there; it. was dark. Q. Do you know Burt Pixley — he there? A. Yes; I think so.' Q. Was Mr. White there? A. Ben was in the store; I don’t think he was out on the porch. * * * Q. [After] this conversation, Mr. Reynolds got in the car and left town? A. How is that? Q. Mr. Reynolds left town after the conversation? A. Yes.”
The witness admitted that he had served a term in the penitentiary, for violating the age of consent law, until pardoned.
W. O. Thomas, called by defendant, testified as follows:
“Well, he [Reynolds] was there on the gallery, and somebody said something about the killing, and he said that this fellow, Mr. Shannon, shot a man in the field and killed him, and he understood that he was a pretty bad man; he had killed several men before, and they hadn’t done anything with him. He believed they ought to do something with him. Q. Did he say what should be done with him? A. Well, no, sir; I didn’t hear if he did. I wasn’t [sic] when he first started talking; I was inside the store. I come on out and come around on the front there where they was at. Q. Did you hear any — did you hear him talking to Mr. Aycock? A. No, sir. * * * Q. Did he tell you what it was about? A. No, sir; he didn’t; he wasn’t talking to me particular; several there on the store gallery.”
Witness appears to have lived in the same neighborhood as Aycock, and testified that he had seen him on the evening before giving his testimony, “m'et him coming from Lisbon, then * * * ” went back down there, “and he was down there”; that he and his wife and Aycock came up together in a ear; that this case was not mentioned between them; that he had not talked about it at any time, with any one, prior to the giving of his testimony, or told any one, at any time or place, what he knew about it.
T. T. Land, one of defendant’s counsel, examined Reynolds on his voir dire, and says that he testified that he had not heard any of the facts of the case; that he was free from bias or prejudice, and could make a fair and impartial juror; that (according to the recollection of the witness) he had neither formed nor expressed an opinion concerning it or discussed it with any one “who purported to know the facts”; that he had no feeling in the case whatever; that he (witness) had been district attorney, and was familiar with the situation as between the white and negro drivers, and knew that Reynolds was a white driver; that Reynolds so answered when asked the question.
T. A. Reynolds, the juror, testified that he made no such statement as that attributed to him by Aycock; that he did not mention Shannon’s name; that he and Pixley went into the store together; that something was said about the negro drivers, and he said, “They were going to cause trouble in the field if we didn’t get shed of them”; and he said something to the effect that he would be willing to go and help run them off, but that he said nothing about what ought to be done with Mr. Shannon; that if Aycock asked him about the killing, he did not remember it, and that he said nothing about it; that he had no prejudice whatever against Shannon ; that he had met him, but (as we understand his testimony) was not well ac *645 quainted with him; that he did not know Dunson, and had no interest in the case; knew nothing of the facts of the case except from rumors, and had formed no opinion.
Burt Pixley testified that Aycock came to him and wanted him to go and talk to Mr. Land about the case, that he asked him about it and about the trip to Lisbon with Reynolds, and what he would swear to about it. He further testified that, on the Saturday night after the killing, he and Reynolds went together to Lisbon; that they went into the store together, stayed there about 2% hours and left together; that they were together while there, and that he did not hear Reynolds make any such statement about Shannon as was attributed to him by Aycock; that Aycock came into the store where they were, and that was the only place where he saw him; and that Reynolds was in the store also. Asked whether Reynolds was on the gallery, he answered:
“Well, we was on the gallery once or twice; well the door — not exactly on the gallery; he wasn’t on the gallery, I don’t think airy time.”
He admits that he might have been, at some moment, in the rear of the store while Reynolds was in front. Being asked whether Reynolds could have had a conversation without his hearing it, his reply was, “Not much; he might have said a word or two,” but witness did not think they were separated far enough for him not to have heard what Aycock attributed to him.
H. A. McDonald testified that he was present at the Lisbon store on the occasion in question; that Reynolds came there before Aycock, and that Aycock was the first to leave; that he was in the store when Reynolds and Aycock were there; that—
“Aycock walked in and asked Burt [meaning Reynolds as he explained] what did he know about the Shannon case, trouble, out there, and Burt said, ‘All you fellows out there know as much about that as I do.’ He said: T don’t know but very little about it, but what I have heard there, that it was caused — the boy’s death was caused — from those negro drivers out there.”
Witness heard him say nothing about what should be done with Shannon, or about Shannon having killed a number of men, and nothing having been done to him. Witness further says:
“I didn’t think he [Aycock] talked to Burt on the gallery. He talked to him inside the store, asked him about the Shannon trouble, inside the store. Q. Burt — you speak of Burt; that is Mr. T. A. Reynolds? A. Yes. Q. Now, did the conversation stop right there; nothing else said about it? A. Why, no, sir; Burt went on to say that the negroes caused the trouble, and that he would be in with the drivers if they went out there to run the negroes out of the field. Pie talked there some but about negro drivers. * * * Q. Didn’t he say, in substance, that Mr. Shannon was taking up for the negro drivers, and that the killing was due directly to that; something to that effect? A. He said that the killing, from what he had heard, was directed to that; but, as far as saying that Mr. Shannon was taking up for the negro drivers, I didn’t hear it. Q. What did he say about Mr. Shannon? A. He didn’t say anything about him, only that he killed that man on account of the negro drivers. Q. Killed him on account of the— A. That was what he heard.” Redirect examination. “Q. Did he say anything about whether Shannon was guilty or innocent? A. I didn’t hear him say. Q. Expressed no opinion about his guilt or innocence? A. No, sir. Q. Expressed no opinion what should be done to Shannon? A. No, sir. Q. Expressed no feeling of ill will to Shannon? A. No, sir.”
It will be seen from the foregoing that Aycock’s version of his conversation with Reynolds is entirely uncorroborated, and that he is contradicted in several of his statements. He says that he propounded his question while on the porch, and it is not likely that he repeated the same question. But McDonald says that the question was asked inside the store; and his version of the answer is totally different from that of Aycock, and is positive, while Aycock gives what he says was about the substance of the answer. McDonald is corroborated as to the place where the conversation took place by *647 Pixley, and to some extent as to the conversation. Aycock testified that he made no attempt to assist, in getting witnesses, and is contradicted on that point by Pixley, and did not take the stand in rebuttal of Pixley’s circumstantial statement on that subject. Aycock says that Reynolds left, the store in a car. McDonald says that Aycock left before Reynolds. Thomas, called by defendant as we assume, to corroborate Aycock (whose statement is set up as the ground for the new .trial), fails to corroborate him, says that he heard no conversation between Aycock and Reynolds, and gives his own version of what Reynolds said, and which he says was addressed, not to him in particular, but to several there on the store gallery, none of whom are named or produced to corroborate him. He also testifies to a reticence on his own part that seems to us unnatural and unaccountable.
Upon the whole, we conclude that the question presented is one which the trial judge was, in a much better position to decide than are we, and we find no sufficient reason for disagreeing with him as to its proper disposition. • The judgment appealed from is therefore
Affirmed.